| STATE OF SOUTH DAKOTA | * | IN CIRCUIT COURT |
| | :ss | |
| COUNTY OF GRANT | * | THIRD JUDICIAL CIRCUIT |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ALAN BERGQUIST, D.C.

        Plaintiff,

vs.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE CO.
and HARTFORD LIFE AND
ACCIDENT INSURANCE CO.

        Defendants.

CIV. 09-

SUMMONS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE STATE OF SOUTH DAKOTA SENDS GREETINGS TO THE ABOVE-NAMED
DEFENDANTS:

You are hereby summoned and required to serve upon Lee Schoenbeck,
Plaintiff's attorney, whose address is P. O. Box 1325, Watertown, South Dakota, 57201,
an Answer to the Complaint which is herewith served upon you and filed in the Grant
County Clerk of Courts Office for the Third Judicial Circuit, Grant County, South Dakota.
You must serve the Plaintiff's attorney with your Answer within thirty (30) days after the
service of this Summons upon you, exclusive of the day of service. If you fail to do so,
judgment by default will be taken against you for the relief demanded in the Complaint.

This action involves an insurance dispute.

Dated this 22 day of April 2009.

        SCHOENBECK LAW

        By:
        LEE SCHOENBECK
        Attorney for Plaintiff
        P. O. Box 1325
        Watertown, South Dakota, 57201
        (605) 886-0010

| STATE OF SOUTH DAKOTA | • | IN CIRCUIT COURT |
| | :ss | |
| COUNTY OF GRANT | • | THIRD JUDICIAL CIRCUIT |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ALAN BERGQUIST, D.C.

        Plaintiff,

vs.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE CO.
and HARTFORD LIFE AND
ACCIDENT INSURANCE CO.

        Defendants.

CIV. 09-

COMPLAINT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

COMES NOW the Plaintiff, Alan Bergquist, D.C., by and through his attorney of record, Lee Schoenbeck, and for his cause of action states and alleges as follows:

1. Plaintiff, Alan Bergquist, D.C. (Dr. Bergquist), is a resident of Grant County, South Dakota.

2. Dr. Bergquist was insured by State Farm Mutual Automobile Insurance Co. (State Farm) with a disability income insurance policy, policy no. HB754293-4141 (State Farm Policy).

3. State Farm has home offices in Bloomington, Illinois, and does business in South Dakota, including the sale of the State Farm Policy.

4. Dr. Bergquist was insured by Hartford Life and Accident Insurance Co. (Hartford) with a disability income insurance policy issued through the National Business Association for Chiropractors, policy no. AGP5672 (Hartford Policy).

5. Hartford has home offices in Simsbury, Connecticut, and does business in South Dakota, including the sale of the Hartford Policy

**COUNT I – STATE FARM BREACH OF CONTRACT**

6. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

7. Dr. Bergquist began experiencing occasional sharp electrical sensations radiating through his right lower cervical spine to his shoulder, from which

he would experience involuntary movement of the shoulder due to the contraction of muscles through his neck and upper shoulder region.

8. The electrical sensations and the subsequent involuntary movements of Dr. Bergquist's shoulder forced him to sell his chiropractic practice, and discontinue treating patients.

9. Dr. Bergquist submitted a claim for disability benefits pursuant to the State Farm Policy in February 2007.

10. The State Farm Policy provides that total disability benefits will be paid if the insured has an "inability to perform, with reasonable continuity in a usual and customary manner, the substantial and material acts of the insured's occupation, business, or profession."

11. The State Farm Policy had only a 180 day elimination period.

12. Manipulation of the cervical spine is a substantial and material act in Dr. Bergquist's chiropractic profession.

13. Dr. Bergquist cannot perform cervical spine manipulation in the usual and customary manner, due to the involuntary reaction he has to the electrical sensations in his neck and shoulder.

14. As a result of the involuntary reaction to the electrical sensations in his neck and shoulder, Dr. Bergquist is unable to perform, with reasonable continuity in a usual and customer manner, the substantial and material acts of his chiropractic profession.

15. On January 14, 2009, State Farm finally issued a decision with respect to the pending claim.

16. State Farm based its denial on their determination that Dr. Bergquist was "not totally disabled as defined in [the] policy."

17. State Farm breached the State Farm Policy contract, and owes Dr. Bergquist the benefits provided under the contract.

### COUNT II – HARTFORD BREACH OF CONTRACT

18. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

19. The Hartford Policy provides that Dr. Bergquist is totally disabled if he is unable to do the essential duties of his occupation.

2

20. Cervical spine manipulation is an essential duty of a chiropractic occupation.

21. Cervical spine manipulation is substantial and not incidental to Dr. Bergquist's occupation.

22. Cervical spine manipulation is fundamental to Dr. Bergquist's occupation.

23. Cervical spine manipulation cannot reasonably be omitted or changed in Dr. Bergquist's occupation.

24. Dr. Bergquist has electrical sensations that cause involuntary movements to his right shoulder when he is performing active patient care, including cervical spine manipulation.

25. Dr. Bergquist stopped working in his chiropractic occupation due to the neck pain and resulting involuntary movements to his right shoulder while involved in patient care.

26. The Hartford Policy has only a 90 day elimination period.

27. Dr. Bergquist is disabled under the terms of the Hartford Policy.

28. On March 5, 2008, Dr. Bergquist submitted an Application for Disability Income Benefits pursuant to the Hartford Policy.

29. On September 12, 2008, Hartford denied benefits under the Hartford Policy.

30. Hartford breached the Hartford Policy contract, and owes Dr. Bergquist the benefits provided under the contract.

## COUNT III – STATE FARM BREACH OF DUTY OF GOOD FAITH AND FAIR DEALINGS

31. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

32. Every contract in South Dakota includes the duty of good faith and fair dealings.

33. State Farm did not honor its duty of good faith and fair dealings with respect to Dr. Bergquist.

34. State Farm preferred itself and its own interest, in contravention of its duty of good faith and fair dealings.

3

35. State Farm breached its duty of good faith and fair dealings owed to Dr. Bergquist.

### COUNT IV – STATE FARM COMMITTED BAD FAITH

36. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

37. State Farm drafted the State Farm Policy.

38. The State Farm Policy provides that benefits would be paid if the professional isn't able to do the usual and customary duties of a substantial material act of the occupation.

39. State Farm's own expert identified for them on October 27, 2008, that Dr. Bergquist should not do cervical spine manipulation, given his condition, which is one example of the bad faith basis of State Farm's denial.

40. State Farm acted in bad faith toward Dr. Bergquist.

41. State Farm's conduct injured Dr. Bergquist.

### COUNT V – STATE FARM'S BREACH OF FIDUCIARY DUTY

42. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

43. Dr. Bergquist obtained disability income insurance coverage from State Farm.

44. Dr. Bergquist trusted State Farm to fairly meet their disability income insurance coverage obligations under the disability income insurance contract.

45. Once Dr. Bergquist was disabled, he had no option but to trust State Farm to look out for his interests under the disability income insurance contract—he couldn't change disability income insurance carriers at that point in time.

46. State Farm preferred their interests to the interests of their insured by repeatedly refusing to honor the disability income insurance relationship.

47. State Farm breached their fiduciary duty owing to Dr. Bergquist.

### COUNT VI - STATE FARM ATTORNEY'S FEES

48. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

4

49. State Farm had an insurance contract with Dr. Bergquist.

50. State Farm refused to pay the full amount of the disability income insurance responsibility owing to Dr. Bergquist.

51. State Farm's refusal to pay was without reasonable cause, as the language of the State Farm Policy does not provide a reasonable basis for the position taken by State Farm in refusing to pay the disability income insurance benefits to Dr. Bergquist.

52. Additionally, State Farm's refusal was vexatious, because State Farm ignored the clear language of the contract and all of the attempts by Dr. Bergquist to get State Farm to consider the terms of the contract as it applied to Dr. Bergquist.

53. State Farm owes Dr. Bergquist for the attorney's fees incurred by him to enforce his insurance contract against State Farm.

### COUNT VII - HARTFORD ATTORNEY'S FEES

54. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

55. Hartford had an insurance contract with Dr. Bergquist.

56. Hartford refused to pay the full amount of the disability income insurance responsibility owing to Dr. Bergquist.

57. Hartford's refusal to pay was without reasonable cause, as the language of the Hartford Policy does not provide a reasonable basis for the position taken by Hartford in refusing to pay the disability income insurance benefits to Dr. Bergquist.

58. Additionally, Hartford's refusal was vexatious, because Hartford ignored the clear language of the contract and all of the attempts by Dr. Bergquist to get Hartford to consider the terms of the contract as it applied to Dr. Bergquist.

59. Hartford owes Dr. Bergquist for the attorney's fees incurred by him to enforce his insurance contract against Hartford.

## COUNT VIII - STATE FARM PUNITIVE DAMAGES

60. Dr. Bergquist realleges and incorporates by reference hereto all paragraphs as through they were fully set forth herein.

61. With respect to Dr. Bergquist, State Farm has been guilty of oppression, fraud, or malice, actual or presumed, or willful or wanton misconduct, and is therefore subject to exemplary damages.

WHEREFORE, Dr. Bergquist prays for judgment against State Farm and Hartford as follows:

1. For the contractual amounts owing by State Farm and Hartford under the disability income insurance contracts.

2. For attorney's fees pursuant to SDCL 58-12-3.

3. For a reasonable amount to be determined by a jury for the tortious conduct of State Farm toward Dr. Bergquist.

4. For exemplary damages against State Farm in an amount to be determined by a jury.

Dated this 22ⁿᵈ day of April 2009.

SCHOENBECK LAW

By: _____
LEE SCHOENBECK
Attorney for Plaintiffs
P. O. Box 1325
Watertown, South Dakota 57201
(605) 886-0010

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES.**

6

APR-27-2009(MON) 09:55                                                      P. 010/025

| STATE OF SOUTH DAKOTA | * | IN CIRCUIT COURT |
|---|---|---|
| | :SS | |
| COUNTY OF GRANT | * | THIRD JUDICIAL CIRCUIT |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ALAN BERGQUIST, D.C.                  *        CIV. 09-
                                      *
         Plaintiff,                   *
                                      *
                                      *     PLAINTIFF'S INTERROGATORIES,
vs.                                   *     REQUESTS FOR PRODUCTION
                                      *     OF DOCUMENTS AND
STATE FARM MUTUAL                     *     REQUEST FOR ADMISSIONS TO
AUTOMOBILE INSURANCE CO.              *     DEFENDANT HARTFORD LIFE
and HARTFORD LIFE AND                 *     AND ACCIDENT INSURANCE CO.
ACCIDENT INSURANCE CO.                *     (SET I)
                                      *
         Defendants.                  *
                                      *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TO:   DEFENDANT HARTFORD LIFE AND ACCIDENT INSURANCE CO.:

PLEASE TAKE NOTICE that, Plaintiff hereby propounds the following written interrogatories, requests for production, and request for admissions, for answer under oath within 45 days of the date of service hereof.

Plaintiff's interrogatories and requests for production shall be deemed to be continuing in nature. Therefore, if any information is discovered by, or becomes known to, Defendant, Defendant's attorney, or anyone acting on Defendant's behalf, after responding to the same and before trial, which would alter, change, or add to the responses provided, Plaintiffs thereby demands that such information be provided forthwith.

### DEFINITIONS

1. "You" or "your" means the Defendant, Hartford Life and Accident Insurance Co. (Hartford), its predecessors in interest, if any, its present and former officials, executives, officers, employees, agents, and all other Persons acting or purporting to act on behalf of the defendant.

2. "Document(s)" means and includes any type of writing or recording and includes, without limitation, all written materials (including drafts of such materials) such as letters, memoranda, reports, studies, minutes, diary entries (including calendar entries indicating dates and participants to any meetings), notes or records of telephone conversations, conferences or other oral communications and appointment records, time records, ledgers, journals,

financial or accounting records, personnel records, annual reports, trial balances, work papers, schedules, photographs, videos, recordings, charts, graphs, transcriptions, tapes, discs, printouts, data compilations from which information can be obtained, databases stored in computers (whether magnetically or digitally), e-mail messages, and other electronic data processing materials. It also includes each copy of a Document that is not identical in all respects with or that contains any notation not appearing on any other copy of such Document(s).

3. "Claim" refers to claim which is the subject of the Plaintiff's Complaint.

4. "Hartford Policy" refers to the long term disability income insurance policy issued to the National Business Association for Chiropractors, policy no. AGP5672, with Alan Bergquist as the insured, and in force on the date of the Claim.

5. To "identify" a Person means to state his or her name, current or last known address, telephone number and employment now and at the time material to the occurrences giving rise to the Complaint.

6. To "identify" a document means to describe it sufficiently to be able to later request its production and to identify as aforesaid, the Custodian thereof, or to attach it to a copy of your answers. If any such document was, but is no longer in your possession, or subject to your control, state the disposition of said document and the reasons for such disposition and the date thereof.

7. "Person" means a natural Person, corporation, association, partnership, sole proprietorship or public entity.

8. "Hartford Denial Letter" means the letter of September 12, 2008, from John-Paul Lavalla, Senior Ability Analyst with Hartford Life and Accident Insurance Co., a copy of which is attached hereto as Exhibit A.

## INTERROGATORIES

1. Please identify the Person who is answering these Interrogatories.

2. Please set forth each fact, reason, and provision in the Hartford Policy that supports the statement by You in Exhibit A, to Dr. Bergquist that: "your claimed restrictions do not rise to a level of impairment that prevents you from being totally or partially unable to perform the material and substantial duties of your occupation."

3. Identify each of the Hartford employees, agents, contractors, or representatives that participated in or contributed to Your conclusion from Exhibit A described in the preceding interrogatory. For each of these Persons, please set forth their qualifications, experience, and training that You believe makes them a Person capable of reaching this conclusion.

2

4. Please Identify all of the Documents that the individuals that You've Identified in
the preceding Interrogatory reviewed in reaching the conclusion about Dr.
Bergquist's Impairment that is reflected in Interrogatory no. 2 above. Specifically
Identify which Documents were reviewed by which of the Individuals in Your
answer to the preceding interrogatory. Do not provide a generic list of
documents that does not Identify which ones each Person reviewed.

5. Please Identify and list all employees, agents, or representatives of Your
company who were in any way responsible for evaluating or making any
decisions with respect to the Claim.

6. Please Describe the process that You utilized with respect to evaluating or
making decision with respect to the Claim.

7. Please Identify all Documents that You reviewed when evaluating or
making decisions with respect to the Claim.

8. As to each employee or agent named in response to Interrogatory 3, list
the job title or classification held by the individual at the time he or she
handled or processed Plaintiff's Claim, and his or her current title or job
classification.

9. If any Person Identified in response to Interrogatory no. 3 no longer works
for You, provide his or her name, last position with Your company, last
known address and telephone number.

10. Of those Individuals Identified in response to Interrogatory no. 3, provide
the name of that Individual's supervisor at the time Plaintiff's Claim was
handled.

11. For each supervisor Identified in response to the preceding interrogatory,
list that supervisor's job title, duties, and authority at the time Plaintiff's
Claim was handled and the supervisor's current title or job classification.

12. If any supervisor Identified in response to Interrogatory no. 10 no longer
works for You, provide his or her name, last position with Your company,
and last known address and telephone number.

13. Describe the experience, training, and educational background of each
Person who investigated, evaluated, managed, reviewed, or otherwise
handled Plaintiff's Claim, or rendered any written or oral opinion and/or
report regarding the Claim.

14. Have You ever had a claim asserted against You for attorney's fees
pursuant to SDCL 58-12-3?

3

15. If Your answer to the preceding interrogatory is in the affirmative, and if after the hearing, a party was allowed to proceed with a claim for attorney's fees, please describe each action by providing the names and addresses of all parties, the date of the filing of the action; the venue in which the action was filed; the name of counsel adverse to You; whether the action was in federal or state court; and the terms of any disposition of the action.

16. Please identify any Person that You will expect to call as an expert with respect to this litigation.

17. For each expert identified in response to the preceding interrogatory, please state:

    a.    the experience and qualifications of the expert;

    b.    the subject matter on which the expert is expected to testify;

    c.    the substance of the facts and opinions to which the expert is expected to testify;

    d.    a summary of the grounds for each such opinion;

    e.    a bibliography of all literature, treatises, papers or other publications supporting the opinion of the expert;

    f.    any articles, books, or other publications which the expert has written or to which the expert has contributed; and

    g.    all prior testimony, whether in a deposition, at a hearing, or a trial in the last four (4) years; and with respect to each such testimony, please provide the date of the testimony, the venue of the case in which the testimony was given, the caption and/or name of the case in which the testimony was given, and the name, address, and telephone number of the attorney who retained your expert.

18. Please identify each and every time You communicated with Plaintiff regarding the Claim.

19. Please state whether the communication(s) identified in the preceding interrogatory were:

    a.    In writing or oral discussion(s);

    b.    The date(s) of the communication(s); and

    c.    The topic of the communication(s).

4

20. Please identify the Person(s) who communicated with Plaintiff on Your behalf for each and every date of communication.

21. Please identify each and every Document that You generated as a result of Your communication(s) with Plaintiff regarding the Claim. Please attach to your answers any Documents identified in answer to this Interrogatory.

22. Please identify all Persons who have knowledge or information relating to the claims and defenses made herein or known to you, or your counsel, associates, investigators, employees, or agents, whether obtained in the course of investigation, preparation of trial, or otherwise.

23. With regard to each Person identified in response to the preceding interrogatory, please state what information or knowledge you believe each such Person possesses concerning the claims and defenses herein.

24. Please Describe all investigation that You did when You received the Claim.

25. As any part of their compensation or evaluation, do You utilize any type of incentive program for Your insurance adjusters or claims representatives, or any of the Persons identified above in these interrogatory answers, or any Persons that supervise any of the preceding in any respect?

26. If Your answer to the preceding Interrogatory is in the affirmative, please Describe the incentive program, and identify and provide copies of all Document(s) with respect to the establishment, operation, execution, and explanation of the incentive program.

27. As any part of Your employee compensation or evaluation, do You utilize any type of bonus or incentive program at Your company?

    a.   If You do, please identify the time periods the program was in place, and Describe the program;
    b.   If You do, please provide copies of the Documents that Describe and implement the program; and
    c.   If You do, please identify which of Your personnel are covered by the program.

28. Please list for the past five years all bonus, recognition, or incentive-type payments or awards under any compensation plans You have, for the Persons that You have identified as in Your answer to Interrogatory nos. 3 and 10.

29. Please identify the individual goals and business unit goals for each of the Persons that You identified in Interrogatory nos. 3 and 10 for the last five years.

30. Please identify any manual, guide, policy, or directive You have for Your claims department, with respect to how the claims department should handle claims for benefits, and specifically with respect to benefits provided by the Disability

Income Insurance Policy. Please produce a copy of all Documents that You identify in answer to this Interrogatory.

31. Please identify each and every tangible item or exhibit relating to or bearing upon any fact or legal issue in the above entitled lawsuit in Your possession, Your attorney, or any other Person or entity working for, or acting behalf of, You.

32. Please identify each and every tangible item or exhibit You expect to rely upon during the trial of this matter.

33. Please set forth the amounts You have reserved for this Claim, when those reserves were established, whether any changes have been in the reserves, and what new amounts were reflected after changes were made in the reserves.

34. Did any medically trained Person review the Claim, besides Dr. Donald Getz, identified in Exhibit A? If so, for the other individuals, identify them, as that term is defined above, and provide the following:

   a. The dates on which they handled any aspect of the Claim;
   b. The Documents they reviewed in handling the Claim;
   c. The Persons they interviewed in handling the Claim;
   d. Any Documents they produced containing any of their conclusions as part of their work on the Claim. Please produce copies of those Documents with Your answers to these Interrogatories; and
   e. Set forth the curriculum vitae and any other Information upon which You base the decision that this Person has the medical qualifications to address some aspect of the Claim.

35. With respect to Dr. Donald Getz, did he author any reports or contribute any other Information to the decision You made on the claim, besides the three-page August 14, 2008, re-review and the five-page (fifth page is virtually blank) August 5, 2008, initial claim report? If he did, please identify the other Information, who it was communicated to at Hartford, how it was communicated to Hartford, and produce copies of all Documents or memorandum that reflect any of the information and/or opinions provided to You by Dr. Donald Getz.

36. Identify all Information provided to Dr. Donald Getz for his work with respect to the Claim, including the following:

   a. The Person who provided the Information to him, when they provided it, and what Information they provided on each occasion;
   b. Produce copies of all Documents provided to him;
   c. Was any information provided in other than written form, and if so by whom, when, and what Information was provided on each occasion?

6

37. Please set forth in detail the source for Dr. Getz's statement in his August 5, 2008, report that: "Documents received from the claimant indicate a self-diagnosis of possible multiple sclerosis . . ."

38. Identify (as that term is defined above) all doctors of chiropractics that You consulted with or that participated in any manner in Your handling of the Claim.

39. As to each Person who prepared or assisted in the preparation of any responses to the preceding interrogatories, state that person's name, business address, job title and duties, and what that person did with respect to preparation of the interrogatory responses, including by number the specific interrogatory responses that the person prepared or assisted in preparing.

40. Please state whether each answer to each interrogatory set forth herein accurately sets forth all facts known to You relating to the subject matter of the interrogatory.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. Please produce all Documentation for each payment that you have listed in Your answer to Interrogatory no. 28 above, to each of the Persons You identified. The Documents should include standards utilized, and any information about how the decision was made to make the particular payment.

2. Please produce all Documents that are part of the process for the development of the criteria or standards for awarding the bonuses, incentives, or recognition payments, for any of Your bonus or incentive plans for Your employees for the last five years.

3. Please produce a copy of all Document(s) You have in Your possession regarding the Claim, which includes the entire claims file, and any Documentation with respect to the reserve that have been established for the Claim or litigation.

4. Please produce a copy of all Document(s) You generated in processing the Claim.

5. Please produce copies of all training materials used to train all of the Persons that You have identified in the preceding Interrogatories, as having any part of the duties and services they provided to You, in handling any aspect of Dr. Bergquist's Claim.

6. Please produce copies of any statements taken of Plaintiff by any person, including any adjuster, agent, attorney or any other person acting on Your behalf and pertaining to any matter connected with this Claim.

7. Please produce copies of all Documents that You have identified in the preceding Interrogatories.

8.   Please produce a complete copy of the Hartford Policy.

## REQUEST FOR ADMISSIONS

1.   Admit that cervical spine manipulation is fundamental or inherent to Dr.
     Bergquist's practice as a Doctor of Chiropractics.

2.   Admit that cervical spine manipulation is an essential and not incidental part
     of Dr. Bergquist's practice as a Doctor of Chiropractics.

3.   Admit that cervical spine manipulation cannot reasonably be omitted from Dr.
     Bergquist's practice as a Doctor of Chiropractics.

4.   Admit that Dr. Suga described Dr. Bergquist's limitations as "probably
     permanent."

5.   Admit that Dr. Bergquist's occupation has been the treatment of patients as a
     Doctor of Chiropractics.

DATED this 22 day of April 2009.

SCHOENBECK LAW

By:

LEE SCHOENBECK
Attorney for Plaintiff
P.O. Box 1325
Watertown, South Dakota  57201
(605) 886-0010

8



THE
HARTFORD

September 12, 2008

Alan Bergquist
47984 Fish Haven
Big Stone City, SD  57216

Policyholder:  National Business Association For Chiropractors
Policy No.:      AGP 5672
Insured:          Alan Bergquist
Insured ID:     80001 10437

Dear Mr. Bergquist:

We are writing to you regarding your claim for Long Term Disability (LTD) benefits under the
group insurance policy number AGP 5672 for the National Business Association For Chiropractors.
We have completed our review of your claim for benefits and have determined that you do not meet
the definition of Disability.  Accordingly, no LTD benefits will be payable to you under the terms
of this Policy.

Benefits are payable under the Policy if you meet the following definition of Disability found in the
Policy:

"Disability or Disabled means Total Disability or Disabled and Working
Disability"

"Disabled and Working means that You are prevented by:
1)  Injury;
2)  Sickness;
3)  Mental Illness;
4)  Substance Abuse; or
5)  Complications of Pregnancy;
from performing some, but not all of the Essential Duties of Your Occupation, are
working on a part-time or limited duty basis, and as a result, during the first 24
months of disability payments, Your Disability Earnings are more than 20% but
are less than or equal to 80% of Your Indexed Pre-disability Earnings, and beyond
24 months of disability payments, Your Disability Earnings are more than 20%,
but are less than or equal to 60% of Your Indexed Pre-disability Earnings."

"Total Disability or Totally Disabled means disability which:
1)  during the Elimination Period and the first 24 months during which
Total Disability Benefits are payable, wholly and continuously
prevents You from performing the Essential Duties of Your
Occupation; and
2)  after that, wholly and continuously prevents You from engaging in
Any Occupation."



EXHIBIT

A

APR-27-2009(MON) 09:57                                                              P. 019/025
02/18/2009  11:17    8608439144                                                    PAGE  03/08

"Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location."

We based our decision to deny your claim for LTD benefits upon Policy language and all documents contained in your file, viewed in its entirety. Below is a list of the pertinent documents that are relevant to this claim decision:

1. Application for Disability Income Benefits completed by you on March 5, 2008.
2. Attending Physician's Statement (APS) completed by Dr. Robert C. Suga on March 21, 2008.
3. A letter to Dr. Robert C. Suga from you dated March 1, 2008.
4. A letter to us from you dated April 8, 2008.
5. A letter to us from Dr. Mike Hendricks dated April 25, 2008.
6. A letter to us from you dated April 25, 2008.
7. Surveillance video and accompanying report depicting your activities on May 27, 2008 and May 28, 2008 conducted by ICS/Merrill.
8. Surveillance video and accompanying report depicting your activities on June 18, 2008 and June 19, 2008 conducted by ICS/Merrill.
9. Medical records for the period of August 19, 1998 through February 6, 2007 from the Federal Aviation Administration.
10. Your statement and results of your interview with Investigator Kenneth Tingley on July 9, 2008.
11. Medical records for the period of May 20, 2008 through July 2, 2008 provided by you.
12. Our Medical Case Manager's review of your claim on July 24, 2008.
13. An independent medical review report by Dr. Donald Getz dated August 5, 2008.
14. An addendum to the independent medical review report on August 14, 2008 by Dr. Donald Getz.

On March 5, 2008 you submitted an Application for Disability Income Benefits that indicates that you last worked as a Chiropractor on October 24, 2007. You stated that you stopped working due to neck pain with electrical sensations and involuntary movements to the right shoulder that prevented you from performing active patient care and manipulations. You felt your condition was the result of a combination of your work and high school football. You stated that prior to stopping work you just lived with the pain and took over-the-counter medication. You advised that you first treated with Dr. Robert Suga for this condition on February 14, 2008 and that you were no longer treating with him. You also noted in your claim form that you perform the physical duties of a chiropractor which include manual manipulations, repetitive pushing and continuous impulses.

On March 21, 2008, Dr. Suga completed an Attending Physician's Statement (APS). He stated that your current primary diagnosis was cervicalgia and your secondary diagnosis was joint pain in the shoulder. The APS indicated that he first treated you for this condition on February 14, 2008; the

onset of this condition started in the late fall of 2005; you were being treated by him "as needed";
and that a next office visit was not scheduled. When Dr. Suga completed the section regarding your
restrictions and limitations, he noted the following: "This patient is a chiropractor (DC) who has
written the enclosed letter regarding care since 2005." Dr. Suga also wrote on the APS: "Patient
states" that you became unable to work due to your condition as of November 26, 2007. The
enclosed letter from you to Dr. Suga dated March 1, 2008 stated the following:

> "Thank you for taking a look at my neck a couple weeks ago.  Since there was no
> referral letter sent to you with background information on my health, I will give
> you a little of that in letter form so you have it when my insurance company
> contacts you.
>
> Beginning in late fall of 2005, I began having sharp electrical sensations from the
> right side of my neck to the tip of the right shoulder. ...  ...An MRI and C spine
> films were taken which as you've seen, were unremarkable other than early
> degenerative changes and foraminal narrowing. ...
>
> ...Any jarring type motion with my arms' causes increased pain in the neck with
> increasing frequency of electrical sensations to my shoulder.
>
> I hope this information helps.  I've enclosed the two claim forms that I need you
> to fill out.  Let me know if you need anything."

Along with your claim form and letter, you also enclosed record of an office visit with
Dr. Suga on February 14, 2008. The record noted the following:

> "...He states that since 2005 anytime he tries to do any physical activity below the
> shoulder level such as adjustments, etc., he will have severe electrical sensations
> occur in the right trapezius. ... This is something that commonly occurs in
> children. The episodes were occurring probably eight times a day or more with his
> chiropractic work, something that he simply could not stand anymore. ... As a
> secondary note he had an MRI scan of his neck and brain in 2005 and at that point
> there was a concern for demyelinizing disease. ...MRI of the brian was obtained
> without contrast. He had some spotty areas questionable for demyelinizing
> process and come in today for followup of this as well."

Dr. Suga recommended an MRI scan of the brain with and without contrast and also an MRI of the
cervical spine. However, no further records were available.

In a letter to us dated April 8, 2008, you stated that you waited to file your claim for disability
benefits because you were actively exercising and strengthening in hopes that you could return to
active practice but when it did not appear to work, you consulted with Dr. Suga.

Thus far, the information that has been provided does not provide clarification of your limitations or
restrictions. Your letter dated March 1, 2008 also noted that you were receiving treatment from

your chiropractic partner Dr. Mike Hendricks since January 2006. However, due to the fact that records of your treatment were not documented, we were still unable to determine your level of functionality.

Therefore, to clarify your level of functionality, surveillance was conducted on May 27, 2008 and May 28, 2008. On May 27, 2008 you were observed as you departed your residence at 7:38am, drove your vehicle, went to Health First Chiropractic where you remained for 1 hour, went to an exercise facility where you were observed as you ran rapidly on a treadmill for approximately 25 to 30 minutes, went back to Health First Chiropractic where you remained for 7 ½ hours and returned to your residence. You were observed away from your residence for a total of approximately 10 hours and 15 minutes. On May 28, 2008 you were observed as you departed your residence at 9:52am, drove your vehicle, went to the fitness center, went to Health First Clinic where you remained for over 3 ½ hours.

To further clarify your level of functionality, surveillance was conducted on June 18, 2008 and June 19, 2008. On June 18, 2008 you were observed as you departed your residence, drove your vehicle, went to Health First Chiropractic where you remained for over an hour and a half, went to ALCO convenience store, returned to the office where you remained for approximately 2 hours and 20 minutes. On June 19, 2008 you were observed as you departed your residence, drove your vehicle, went to Health First Chiropractic where you remained for 1 hour and 50 minutes, went to Unity Square, returned to the office where you remained for approximately 2 hours and 4 minutes, went to Bill's Super Value grocery store, lifted and carried groceries, put them into your vehicle and returned to your residence.

As part of our claim investigation to clarify your functionality, medical records were requested and received from the Federal Aviation Administration for the period of August 19, 1998 through February 6, 2007. The medical certificate dated February 6, 2007 asks on question 17a if you used any medication (prescription or non-prescription) to which you indicated "No". Question 18 asked if you had ever been diagnosed with, had or if you had any of the following: ...l. Neurological disorders; epilepsy, seizures, stroke, paralysis, etc. to which the claimant indicated "No". ...x. Other illness, disability, or surgery to which you answered "Yes" and provided the explanation of your achilles which was "previously reported." Question 19 asked if you had any visits to a health professional within the prior 3 years to which you indicated "No". When asked if certain conditions were Normal or Abnormal, question 25 "Head, face, neck and scalp" you indicated was "Normal". Question 42 "Upper and lower extremities (strength and range of motion)" you indicated was "Normal". Question 43 "Spine, other musculoskeletal" you indicated was "Normal". Question 44 "Identifying body marks, scars, tattoos" you indicated was "Abnormal" and provided the description of a 15cm linear scar over the left achilles tendon. Question 46 "Neurologic (Tendon reflexes, equilibrium, senses, cranial nerves, coordination, etc.)" you indicated was "Normal".

A claimant interview was conducted on July 9, 2008 with Investigator Kenneth Tingley. During the interview you were asked what disabling condition(s) prevented you from returning to your own occupation. You stated the intense, painful, electric shock sensations that you got from the right side of your neck that goes into your right shoulder. You also got an involuntary muscle contraction in your right shoulder, when you experienced the shock sensation. The involuntary

APR-27-2009(MON) 09:58                                                          P. 022/025
   02/18/2009  11:17   8608439144                                             PAGE  06/08

muscle contraction caused your right shoulder and right arm to jump. You advised that you now get about three episodes a day of the electric shock sensations in the right side of your neck and right shoulder. When you were practicing, you would get approximately 15 to 18 episodes a day. Activity exacerbates the episodes but you could not identify any particular activity that consistently triggers episodes other than working on patients. You got headaches as a result of the muscles pulling in your neck and would take Aleve for that headache pain. You stated that you also had a spondylolisthesis in your lower back.

You stated that you are able to walk with a normal gait, stand in one spot for about 10 minutes, lift and carry items that weigh 40-50lbs, bend at the waist, twist at the waist, turn your head to the left but the range of motion is limited to the right, squat, kneel, push and pull, reach, walk up and down stairs, balance with difficulty due to Achilles tendon surgery 6 or 7 years ago, fully use your hands and fingers, read, concentrate except when you had symptoms, drive for 90-120 miles without any difficulty getting in or out of your vehicle, sit for 30 minutes and shop for about 30 minutes.

You stated that on a typical day you get up, exercise for about an hour either at home or at the gym, spend the rest of the day devoted to household chores, read or go on the computer, devote some of your time to your children and go to bed. You also stated that since you filed your disability claim you run a half marathon on June 8, 2008 and did two sprint triathlons in May 2008 but you had to quit training because the swimming bothered your neck and shoulder. You also indicated that you are not in any formal treatment or therapy however, you are able to do some upper body work involving free weights and a Theraband at home.

During the interview you provided Mr. Tingley with a copy of Dr. Hendricks notes for the period of May 20, 2008 through July 2, 2008. These medical notes from May 20, 2008 state that you continued to have electrical sensations to your right shoulder multiple times per day but that you realized that there probably is not much that they are going to do for it. It states that you had been using Aleve and Ibuprofen quite frequently which only helps temporarily. The medical record from July 2, 2008 stated that you had been using some hydrocodone to allow you to get out of bed and function which helps for a couple of hours.

During our initial review of your claim, you indicated that you were unable to provide all of your billing information due to the transfer of your information to the new owner. Therefore, we were unable to obtain a clear understanding of all your duties as a chiropractor as you also owned multiple businesses and your duties could also be those of a business owner.

The file was referred to our Medical Case Manager on July 24, 2008. Our Medical Case Manager reviewed your file including, but not limited to, the medical records, the functionality depicted during the surveillance and the statement that you provided during the interview. She felt that you had the ability to return to work in your own occupation despite your medical history.

A copy of the surveillance videos, surveillance reports and the statements obtained during the interview were sent to Dr. Hendricks and Dr. Suga. We advised them that a medical consultant would be contacting them on our behalf.

APR-27-2009(MON) 09:58                                                    P. 023/025
      02/18/2009  11:17      8608439144                               PAGE   07/08

An independent review of your file was conducted by Dr. Donald Getz, Board Certified in Orthopedic Surgery. Dr. Getz attempted to contact Dr. Suga but after three attempts was unable to reach him. Dr. Getz discussed the case with Dr. Hendricks on July 31, 2008. Dr. Hendricks stated that he sees you on a monthly basis and advised that your main problem was "difficulty with patient care." Dr. Hendricks did see the surveillance video and advised that your condition involved your neck, upper back and shoulder pain but that you could work at the sedentary to light level.

Dr. Getz provided the following opinion in his report dated August 5, 2008:

> "...Documents received from the claimant indicate a self-diagnosis of possible multiple sclerosis and self-directed treatment. There are no medical records provided that support this or any other condition that would produce the symptoms.
>
> There has been no neurological consultation, MRI records have not been provided and there is no indication of treatment or further evaluation for multiple sclerosis or medical treatment of any other condition. The single note from orthopedist Dr. Suga reflects a normal physical examination and diagnoses based on subjective symptoms only. Subsequent records and evaluation have not been provided."

Because Dr. Getz indicated that he did not review or receive a copy of the MRI from November 28, 2005, a copy of this report was sent to him for his review. Dr. Getz provided the following addendum to his report on August 14, 2008:

> "There has been no neurological consultation. An MRI reveals degenerative disc disease. There is no indication of treatment or further evaluation for multiple sclerosis or medical treatment of any other condition. ..."

Your medical history included the Federal Aviation Administration medical certificate dated February 6, 2007 regarding your overall physical condition. On this documentation you indicated that the only illness or disability that you incurred was your Achilles, otherwise your physical condition was normal. However, your letter dated March 1, 2008 stated that from January 2006 to the present Dr. Hendricks performed spinal manipulation, modalities, soft tissue mobilization, myofascial release, therapeutic strengthening and stretching and home traction.

You also stated in your March 1, 2008 letter that during early 2007 your symptoms became more frequent and you began having concerns over your patients' safety while performing manipulative procedures. Your limited treatment and reported limitations and restrictions remain unclear. The APS from Dr. Suga did not provide information that would support your reported impairments as he based the completion of the APS on the information you provided.

Based on all the information that has been gathered and reviewed, we have determined that your claimed restrictions do not rise to a level of impairment that prevents you from being totally or partially unable to perform the material and substantial duties of your occupation. This has been

APR-27-2009(MON) 09:58                                                                    PAGE  08/08
02/18/2009  11:17     8608439144

determined through observed activities and multiple medical reviews of your file. Therefore, you do not satisfy the definition of Disability noted above and your claim has been denied.

You may appeal our decision even if you do not have any additional information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. You must write to us within one hundred eighty (180) days of the receipt of this letter. Your letter, which must be signed and dated by you or your legal representative, should clearly outline your position and any issues or comments you have in connection with your claim and our decision to deny your request for benefits under the Policy. Please include your printed or typed full name, Policyholder, and at least the last four digits of your Social Security Number with your appeal letter (i.e. xxx-xx-1234). Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim. Once we receive your appeal, your claim will be reviewed based upon your statements and the documents and notes contained in your claim file. Upon completion of that review, we will advise you of our further determination. We reserve all rights and defenses available to us in making our determination.

Please send your appeal letter to:

Disability Claim Appeal Unit
Hartford Life And Accident Insurance Company
P.O. Box 2993
Hartford, CT 06104-2993

If you have any questions, please feel free to contact our office at 1-888-232-5340. Our office hours are 8:00 AM to 5:00 PM EST, Monday through Friday.

Sincerely,

*Copy 2/18/09*

John-Paul Lavalla, Senior Ability Analyst
Hartford Life And Accident Insurance Company

JPL/lmc

Group Disability Benefits
P.O. Box 2993
Hartford, CT 06104-2993
Fax (860) 843-9144